**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**DONALD E. HONICK,**

**Plaintiff,**

**v.** **Case No. 25-CV-1516-SCD**

**FRANK J. BISIGNANO,**
***Commissioner of the Social Security Administration,***

**Defendant.**

---

**DECISION AND ORDER REVERSING THE COMMISSIONER'S DECISION**

---

Donald Honick seeks social security benefits based in part on chronic, daily migraine headaches. After a hearing, an administrative law judge denied the claim for benefits, finding that Honick's migraines did not significantly limit his ability to work and that Honick could perform light exertional work with certain mental health and postural limitations. Honick seeks judicial review of that decision under section 205(g) of the Social Security Act, arguing that the ALJ erred in evaluating his migraine headaches. Because the ALJ failed to consider how Honick's migraines affected his ability to work, and because that error calls into question the ALJ's finding that Honick could still work, I will reverse the decision denying Honick disability benefits and remand the matter for further proceedings.

## BACKGROUND

Honick applied for disability insurance benefits under Title II of the Social Security Act, claiming that he was unable to work due to various physical and mental impairments. *See* R. 237–38, 276–87.[1]

[1] The transcript is filed on the docket at ECF No. 8-1.

## I. Personal and Medical History

Honick was born in 1970 and grew up in Menasha, Wisconsin. *See* R. 882–83. He dropped out of high school during his junior year and later joined the Navy, where he served for four years, including a combat deployment to Desert Storm. After his discharge from the service, Honick worked for many years as a diesel mechanic and a truck driver. *See* R. 239–75, 278–79, 883. While working on a semitruck in 2001, a large piece of steel struck Honick in the face, causing multiple fractures. *See* R. 804, 832, 836. He had surgery and, since then, he's had chronic, daily headaches.

In November 2018, Honick went to the emergency room after experiencing left-sided facial droop, slurred speech, and left arm weakness. *See* R. 403–33. He also reported left-sided headaches, double vision, dizziness, and several episodes of nausea and vomiting. Imaging confirmed that Honick had suffered a stroke. He underwent a procedure and was discharged a few days later in stable condition. But he didn't return to work. *See* R. 277, 730.

Honick continued to suffer from constant, daily headaches since having the stroke. At a neurology follow-up visit in January 2019, he reported that the left-sided headaches he'd been experiencing prior to the stroke had resolved completely. R. 729–35. However, Honick said he had a new tension-type headache that wrapped around his entire head. The neurologist prescribed preventative headache medication and advised Honick to take over-the-counter pain medication as needed for abortive headache therapy.

At a follow-up visit in August 2019, Honick reported that his headaches had been getting worse. *See* R. 753–59. He said he had constant, daily headaches with autophobia, nausea, phonophobia, dizziness, blurred vision, and disequilibrium. According to Honick, his headaches were severe in intensity and didn't resolve with over-the-counter pain meds. The

neurologist diagnosed post-stroke depression and anxiety, chronic insomnia, and chronic fatigue, all of which likely compounded the chronic migraine headaches. The neurologist prescribed both preventative and abortive headache medication and noted that, given his stroke history, Honick was not a good candidate for triptan headache therapy.

In August 2020, Honick went to the ER for a headache and "feeling drunk." *See* R. 434–44. He had been lying down in his garage, and when he got up, he felt dizzy and had a headache. Honick said he'd had chronic headaches ever since his stroke, and he worried about having another one. Testing, however, was negative.

Treatment notes from the following year indicate that Honick was doing "quite well" progressing from his stroke. R. 783. He returned to work part time as a greeter at a car dealership. *See* R. 249–50, 253, 258, 271–72, 275, 600–04, 783, 794–97, 883. But he continued to use preventative and abortive medication for his headaches.

In November 2022, Honick had a consultative physical examination with A. Neil Johnson. *See* R. 804–07. Honick described his chief complaints as multiple head injuries, memory, stroke, and left wrist/hand surgeries. Dr. Johnson noted that Honick had a history of migraine headaches and opined that Honick's biggest issue was his cognitive difficulty.

In March 2023, Honick returned to the emergency room for another possible stroke. *See* R. 828–31, 869–71. He had been feeling dizzy and lightheaded for two weeks, and he reported having a headache near his right eye. Testing was again negative. At a follow-up visit with neurosurgery, Honick explained that his headaches started at the back of his neck and wrapped around to his eye. He said that they were accompanied by photophobia and right visual changes and that his medications were not helpful. Honick was referred to neurology for further evaluation of headaches with migraine-like features.

Honick was evaluated by neurology in June 2023. *See* R. 832–35. He told the examining nurse practitioner, Kelley L Gossage, that he had had chronic intractable headaches since the 2001 work injury. He described throbbing, pressure-like pain that started on the right side of his face, that radiated into his neck, and that was sometimes accompanied by photophobia. According to Honick, his headache pain ranged in intensity from 2 out of 10 to 10 out of 10. He said that he sometimes missed social activities due to the pain and that, when his headaches were at their worst, he would have blurred vision and needed to lie down in a dark, quiet room to sleep them off. Gossage assessed chronic common migraine headaches, recommended physical therapy, and prescribed gabapentin as needed for severe migraines.

Honick returned to neurology a couple months later. *See* R. 836–39. He told Gossage that he didn't follow through with physical therapy because his wife had had a bad experience with PT in the past. Nevertheless, Honick continued to complain about daily headaches with migraines superimposed on top. Gossage continued Honick's medications and again advised him to give PT a try.

In October 2023, Honick had a consultative psychological examination with Deirdre Radosevich. *See* R. 882–85. He reported a long history of headaches since his workplace head injury and described significant limitations in his day-to-day functioning. Dr. Radosevich diagnosed mild neurocognitive disorder due to a traumatic brain injury and adjustment disorder with anxiety. She assessed marked limitations in Honick's ability to maintain concentration, attention, and work pace; withstand routine work stressors; and adapt to change.

Honick continued to see neurology for his headaches throughout 2024. *See* R. 85–94, 99–100.

## II. Procedural History

Honick applied for disability benefits in September 2021. *See* R. 33, 237–38. He alleged that he was disabled as of November 24, 2018 (when he was forty-eight years old) due to chronic wrist and elbow pain, migraine headaches, memory lapses, chronic fatigue, and a head injury. *See* R. 276–87. In his application materials, Honick reported that any type of activity caused severe pain in his arms; that he got daily, severe headaches; that he was forgetful; and that he was unable to perform basic work duties due to his conditions. *See* R. 288–95, 305–12. He said he tried to limit his daily activities, he wasn't able to help out much around the house, and he couldn't engage in hobbies other than watching television due to his pain. Honick asserted that his impairments significantly affected his physical and mental abilities.

The state agency charged with reviewing disability applications on behalf of the Social Security Administration denied Honick's disability claim upon its review of the available medical records. *See* R. 101–23. The reviewing physicians, Pat Chan and Luis Zuniga, found that Honick's migraine headaches were not a severe impairment. R. 103–09, 115–20. According to Dr. Chan and Dr. Zuniga, Honick did not complain about migraine symptoms and never visited the ER for migraine-related issues. They also noted that Honick said his left-sided headaches had resolved entirely in January 2019, that Honick reported fewer headaches at an August 2020 follow-up visit, and that Honick did not complain about migraines at his November 2022 consultative exam with Dr. Johnson. Ultimately, Dr. Chan and Dr. Zuniga found that Honick could perform medium exertional work with several postural limitations.

The reviewing psychologist at the reconsideration level, John Warren, found that Honick had severe but not disabling anxiety and depression. R. 115–18, 121–22.

After the state-agency denial, Honick had a hearing with an ALJ. *See* R. 49–80. Honick's lawyer amended the alleged date to his client's fiftieth birthday (August 6, 2020). R. 52–55. Honick testified that he last worked part time as a greeter at a car dealership in 2022 and 2023. R. 57–58. He said he got fired after a verbal altercation with a coworker. Honick told the ALJ that he was unable to work due to constant pain and fatigue and anxiety. R. 58–59. He also told the ALJ that he had dizziness all the time, that he constantly felt hungover (despite not consuming alcohol), and that he continued to have almost daily headaches, including some that were severe. R. 66–68. Honick claimed that his impairments significantly impacted his daily activities. *See* R. 59–61, 64–66. A vocational expert testified that employers typically tolerate up to six absences—including arriving late or leaving early—per year *See* R. 74–78.

In November 2024, the ALJ issued a decision finding that Honick was not disabled. *See* R. 30–48. The ALJ considered the disability application under 20 C.F.R. § 404.1520, which sets forth a five-step process for evaluating DIB claims. *See* R. 33–44. Relevant here, the ALJ determined at step two of that process that Honick had three severe impairments: status post stroke, anxiety, and depression. R. 35–36. The ALJ noted that Honick had been diagnosed with several other impairments, including migraines. However, the ALJ explained that those impairments "should be amenable to proper control by adherence to recommended medical management and medication compliance" and that "no aggressive treatment was recommended or anticipated for [those] conditions." R. 36. The ALJ therefore concluded that Honick's other impairments did not "cause more than minimal limitation on [his] ability to

perform basic work functions." *Id.* The ALJ did, however, state that he had considered all of Honick's medically determinable impairments—including those that were not severe—when assessing Honick's residual functional capacity (RFC).

The ALJ determined that Honick could perform light work with certain mental health and postural limitations. R. 38. In reaching that RFC assessment, the ALJ considered Honick's subjective allegations, the objective medical evidence, and the medical opinion evidence. *See* R. 38–42. The ALJ first summarized Honick's allegations, noting that he alleged disability due to pain, migraines, memory lapses, fatigue, and a head injury. R. 38. The ALJ then detailed some of Honick's medical treatment since he suffered the stroke in November 2018. R. 39. According to the ALJ, Honick's statements concerning the intensity, persistence, and degree of limitation of his symptoms were inconsistent with the overall record, which he said revealed relatively good physical functioning and normal physical examinations. R. 39–40. The ALJ also indicated that Honick's symptoms improved with treatment and that the record showed Honick having better functioning than he alleged. R. 40. Finally, the ALJ explained why he found partially persuasive the reviewing physicians' findings that Honick could perform medium work with postural limitations.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Honick did not have any past relevant work. R. 42. The ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Honick could perform. R. 42–43. Based on the step-five finding, the ALJ determined that Honick was not disabled at any time since the amended alleged onset date (August 6, 2020). R. 43–44.

The Social Security Administration's Appeals Council denied Honick's request for review, *see* R. 4–9, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

This action followed. *See* Compl., ECF No. 1; Pl's Br., ECF No. 11; Def.'s Mem., ECF No. 18; Pl.'s Reply, ECF No. 21.

**LEGAL STANDARDS**

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758

F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Honick seeks reversal and remand for rehearing, arguing that the ALJ erred in evaluating his migraine headaches. The ALJ determined at step two of the sequential evaluation process that Honick's migraines were a non-severe impairment. R. 35–36. Although Honick insists that substantial evidence does not support that finding, he acknowledges that a step-two error generally is not a basis for remand. Honick therefore contends that the ALJ reversibly erred at later steps by not considering his migraines when assessing his RFC. The Commissioner argues that the assessed RFC accounts for all limitations supported by the record.[2]

"Deciding whether impairments are severe at Step 2 is a threshold issue." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). Thus, any error in evaluating an impairment at step two ordinarily is harmless if the ALJ finds "even *one* severe impairment" and "continue[s] on to the remaining steps." *Id.* (citing *Castile v. Astrue*, 617 F.3d 923, 927–28 (7th Cir. 2010)). But an ALJ cannot simply ignore a nonsevere impairment after step two. "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (citing Social Security Ruling (SSR) No. 96-8p, Policy Interpretation Ruling, Titles II and XVI:

[2] All parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3 & 4.

Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, 1996 SSR LEXIS 5 (July 2, 1996); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)).

The ALJ here failed to consider how Honick's migraine headaches affected his ability to work. At step two, the ALJ observed that migraines were a medically determinable impairment. *See* R. 35–36. But the ALJ said very little about migraines after that. He acknowledged that Honick alleged disability due to migraines. R. 38. He also noted that Honick complained about headaches in November 2018 and August 2020. R. 39 (citing Exhibits 3F). And he observed that Dr. Johnson documented a history of headache at the November 2022 consultative exam. R. 42 (citing Exhibit 7F). That was it. The term "migraine" appears in the twelve-page decision just twice, "headache" three times. The ALJ, however, never discussed whether Honick's well-documented migraine headaches resulted in any functional limitations. *See Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004) ("Notably absent from the ALJ's order is a discussion of how [the plaintiff's] headaches and blurred vision affected her ability to work."); *Jensen v. Saul*, No. 19-CV-1714, 2021 WL 199292, 2021 U.S. Dist. LEXIS 10179, at *19–20 (E.D. Wis. Jan. 20, 2021) (remanding because the ALJ's decision was "devoid of any reference to the limiting effects of [the plaintiff's] migraines"); *Gillin v. Berryhill*, No. 17-CV-1295, 2018 WL 3742632, 2018 U.S. Dist. LEXIS 132202, at *16–17 (E.D. Wis. Aug. 7, 2018) ("The court finds the ALJ erred by failing to address [the plaintiff's] headaches in his RFC determination."); *Herron v. Colvin*, No. 14-CV-56, 2014 WL 6607179, 2014 U.S. Dist. LEXIS 161947, at *25–26 (E.D. Wis. Nov. 19, 2014) ("But even if [the plaintiff's] migraines could be appropriately characterized as a non-severe impairment, the ALJ was still required to consider any limitations or restrictions imposed by them in his assessment of her RFC.").

The ALJ also omitted significant evidence of Honick's headache impairment when summarizing the objective medical evidence. Honick told providers that he suffered from chronic, daily headaches since injuring his face at work in 2001. *See* R. 804, 832, 836. He also reported left-sided headaches leading up to the November 2018 stroke, R. 403, 412, and while those headaches subsided soon thereafter, Honick continued to complain about constant headaches, *see* R. 729–30. For example, in August 2019, Honick said his headaches were getting worse and were accompanied by autophobia, nausea, phonophobia, dizziness, blurred vision, and disequilibrium. *See* R. 753–54. The neurologist assessed chronic migraines likely compounded by post-stroke depression and anxiety, chronic insomnia, and chronic fatigue and prescribed preventative and abortive headache medication.

Honick's headaches persisted after his amended alleged onset date. In August 2020, he went to the ER for a headache and feeling drunk. R. 434–44. While Honick appeared to be doing well overall in 2021 and 2022, *see* R. 600–04, he continued to use daily preventative headache medication and abortive headache medication as needed, *see* R. 783, 786, 794–96. In March 2023, Honick went to the ER for a possible stroke. *See* R. 828–31, 869–71. Testing was negative, but at his follow-up visit with neurosurgery, Honick reported right-sided headaches with photophobia and vision changes. He was referred to neurology for headaches with migraine-like features. At his visits with neurology during the summer of 2023, Honick reported chronic, intractable headaches that were sometimes severe and accompanied by photophobia. *See* R. 832–39. The examining nurse practitioner assessed chronic common migraine headaches, recommended physical therapy, and prescribed gabapentin as needed for severe migraines.

The ALJ's summary of the objective medical evidence spanned just two paragraphs. *See* R. 39. He mentioned Honick having a headache in November 2018 and August 2020, but he didn't discuss any of the other evidence mentioned above. Although the ALJ did not need to discuss all this evidence in his decision, he impermissibly ignored an entire line of evidence contrary to his step-two finding and his implicit finding that Honick's migraine headaches did not result in any further functional limitations. *See Villano*, 556 F.3d at 563; *Golembiewski*, 322 F.3d at 917.

The Commissioner attempts to excuse the ALJ's shortcoming by emphasizing that the burden was on Honick to prove he suffered from migraine-related limitations. More specifically, the Commissioner faults Honick for not producing a medical opinion that contradicted the prior administrative medical findings of the reviewing state-agency physicians, Dr. Chan and Dr. Zuniga. But the Seventh Circuit has clarified "that the burden is to produce evidence, not opinions." *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021) (citing *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011)). And in this case, Honick did produce evidence suggesting greater limitations. Honick told providers that he sometimes missed social activities due to headaches and that, during his worst ones, he suffered blurred vision and needed to lie down in a dark, quiet room and sleep them off. R. 832. Likewise, he testified at the administrative hearing that he had headaches almost every day, including sometimes severe, stabbing tension headaches. R. 67.

The ALJ did not mention those subjective allegations in his decision, and the reasons he offered for generally discounting Honick's statements do not cast doubt on Honick's alleged migraine symptoms. At step two, the ALJ determined—without any evidentiary support—that Honick's nonsevere impairments (which included migraines) could be

controlled with medication compliance and that no aggressive treatment was recommended for those conditions. R. 35–36. But the ALJ never actually discussed Honick's headache treatment or his response to it. The record shows that providers prescribed both preventative and abortive headache medication, and Honick said neither helped. *See* R. 729, 753, 783, 794, 830–31, 833, 839. Providers also noted that certain treatment was off the table due to Honick's history of stroke. *See* R. 753, 835, 839.[3] Thus, substantial evidence does not support any suggestion that Honick's headaches were, or could have been, controlled with medication.

The ALJ's subjective-symptom evaluation also lacks explanation and support in the record, at least as it relates to Honick's alleged migraine symptoms. *See* SSR 16-3p, Policy Interpretation Ruling, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, 2016 SSR LEXIS 4 (Mar. 16, 2016), revised 2017 WL 5180304 (Oct. 25, 2017); *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). The ALJ determined that Honick's statements concerning the intensity, persistence, and degree of limitation associated with his alleged symptoms were inconsistent with the normal physical exam findings, Honick's improvement with treatment, and Honick's reported activities. *See* R. 39–40. However, it's unclear how the findings the ALJ cited—intact sensation, normal range of motion, intact cranial nerves testing, intact strength, normal and steady gait, normal station, normal coordination, normal finger-nose-finger testing, normal rapid movements, no truncal ataxia, and no meningeal signs—contradict Honick's alleged

[3] The Commissioner criticizes Honick for not pursuing a recommendation for physical therapy. *See* Def.'s Br., at 1–2, 5. The ALJ, however, did not offer that as a reason to discount Honick's alleged symptoms. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here." (citations omitted)). It's also misleading. Honick *did* eventually attend PT for his migraines, and he also tried Botox injections. *See* R. 85–94, 99–100. But for some unknown reason, the ALJ ignored Honick's request to hold the record open so he could submit those recently disclosed records, and the ALJ issued his written decision before they were received and submitted. *See* R. 83–84, 350. The Appeals Council said those records were unlikely to change the outcome of the ALJ's decision. *See* R. 5.

blurred vision and need to lie down when having a bad migraine. Honick also claimed, repeatedly, that his headache symptoms *did not* improve with medication. *See* R. 753–54, 830–31. And the fact that Honick was able to engage in some limited activities at times says little about his ability to keep a job when his headaches were more severe. *See Gould v. Kijakazi*, No. 21-CV-308, 2022 WL 541511, 2022 U.S. Dist. LEXIS 31435, at *11 (E.D. Wis. Feb. 23, 2022) ("Gould's activities of daily living were undoubtedly relevant in assessing the severity of her symptoms. . . . But the ALJ's assessment of Gould's daily activities did not appear to take into account the variable nature of her symptoms.").

Finally, the findings of Dr. Chan and Dr. Zuniga cannot fill the gaps in the ALJ's deficient RFC analysis, for at least two reasons. First, the ALJ did not cite those findings when evaluating Honick's alleged migraine symptoms. *See* R. 38–42. Second, substantial evidence does not support the underlying findings. Dr. Chan and Dr. Zuniga indicated that Honick did not complain about migraine symptoms. *See* R. 104, 119. That's simply not true. Honick alleged disability based on migraines; reported that he suffered from daily, severe headaches that made him nauseous and dizzy; and told providers that at times he missed social activities due to headache pain. *See* R. 277, 288, 305, 832. Dr. Chan and Dr. Zuniga also indicated that Honick had no emergency room visits. *See* R. 104, 119. But Honick did report having a headache during the few times he went to the ER for a suspected stroke. *See* R. 403, 434, 869. Dr. Chan and Dr. Zuniga correctly noted that Honick's left-sided headaches had resolved two months after his stroke. *See* R. 104, 119. However, they didn't mention that, at that same appointment, Honick reported a new, tension-type headache. *See* R. 729. I cannot find any evidence in the record to support the reviewing physicians' finding that Honick was having fewer headaches at a follow-up visit in August 2020. *See* R. 104, 119. That was the

month Honick went to the ER with a headache and feeling drunk; he told the attending physician that his headache was not a new problem—he'd been having chronic headaches ever since his stroke in 2018. *See* R. 434–44. And, like the ALJ, Dr. Chan and Dr. Zuniga didn't mention large swaths of evidence documenting Honick's headache treatment. *Compare* R. 103–09, 115–20 *with* R. 403–44, 600–04, 729–35, 753–59, 783–87, 794–97, 828–39, 869–71. The reviewing physicians' findings therefore could not constitute substantial evidence in support of the ALJ's RFC assessment, even if the ALJ had explicitly relied on them when evaluating Honick's headaches.

## CONCLUSION

In sum, the ALJ here reversibly erred in evaluating Honick's migraine headaches. The ALJ determined that migraines were not a severe impairment but failed to discuss how they impacted Honick's ability to work. That error was not harmless. Honick said that, during his worst headaches, he had blurred vision and needed to lie down in a dark, quiet room to sleep them off. Those statements, if accepted, would likely result in Honick missing too much work to be employable. *See* R. 77 (vocational expert testifying that employers typically tolerate up to six absences per year). Accordingly, for all the foregoing reasons, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 20th day of October, 2026.

STEPHEN C. DRIES
United States Magistrate Judge